
IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2016

**IN RE CONSERVATORSHIP OF SOPHIA ELAINE TAYLOR**

**Appeal from the Probate Court for Davidson County**
**No. 14P1510     Hamilton V. Gayden, Jr., Judge**

_____

**No. M2016-01288-COA-R3-CV**

_____

This appeal arises from the removal of a conservator. The Tennessee Department of Mental Health and Substance Abuse Services ("the Department") filed a petition in the Probate Court for Davidson County ("the Probate Court") seeking removal of Cheryl R. Russell ("Russell") as conservator for Sophia Elaine Taylor ("Taylor"). Russell, Taylor's mother, was alleged to have interfered repeatedly with Taylor's medical treatment. After a hearing, the Probate Court removed Russell as Taylor's conservator and named ComCare, Inc. ("ComCare") as temporary conservator. Russell appeals to this Court. Finding no abuse of discretion or other reversible error, we affirm the judgment of the Probate Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and BRANDON O. GIBSON, JJ., joined.

Cheryl R. Russell, pro se appellant.

Herbert H. Slatery, III, Attorney General and Reporter, and, Brian A. Pierce, Assistant Attorney General, for the appellee, the Tennessee Department of Mental Health and Substance Abuse Services.

Barbara E. Futter, Nashville, Tennessee, Attorney Ad Litem for Sophia Elaine Taylor.

# OPINION

## Background

Taylor, born in 1968, suffers from a variety of health problems both mental and physical. In the interest of her privacy and as it is unnecessary to the resolution of this appeal, we will avoid disclosing the precise details of her illness where possible. Suffice it to say, Taylor's illnesses have required hospitalization and frequent medication. In September 2014, Russell, Taylor's mother, petitioned to be appointed Taylor's conservator. In October 2014, the Probate Court entered an order appointing Russell as Taylor's conservator. In February 2016, the Department filed its own petition, this one seeking to remove Russell as Taylor's conservator. At this time, Taylor resided at the Middle Tennessee Mental Health Institute ("MTMHI"). The Department's petition alleged that Russell had interfered with Taylor's medical treatment by many means, including making excessive phone calls to MTMHI, behaving abusively toward MTMHI staff, and, most critically, refusing to consent to the medical regimen recommended by Taylor's doctors. Both a Guardian Ad Litem and Attorney Ad Litem were appointed in this case. This matter was tried over three days in April and May of 2016.

Dr. Don Elazar ("Dr. Elazar"), Taylor's treating psychiatrist, testified. Dr. Elazar stated that Taylor's condition could be treated with anti-psychotic medications. According to Dr. Elazar, Russell refused to allow doctors to give anti-psychotic medications to Taylor. Dr. Elazar testified that Russell was concerned that adopting the recommended treatment would negatively impact Taylor's white blood cell count. Dr. Elazar stated that this was not a well-founded medical concern. Dr. Elazar testified:

> Q. Dr. Elazar, while Sophia Taylor's been here under your care, has she made any progress toward being discharged from this hospital?
> A. No.
> Q. Why not?
> A. She's still psychotic, violent. She was in . . . 4 point restraints a few days ago.
> Q. And why is it that she's not making any progress?
> A. I feel it's because we don't have her on antipsychotics.
> Q. Why isn't she on antipsychotics?
> A. Because her mother refuses to let us put her on antipsychotics. And she refuses to let us communicate to other doctors to address our concerns.

Dr. Barbara Snell ("Dr. Snell"), Taylor's medical doctor, testified. Dr. Snell testified that while Taylor's white blood cell count was low at times, this was being

monitored and was not necessarily significant. Dr. Snell stated that Russell cancelled an appointment the hospital had set up for Taylor. Dr. Snell testified:

> Q. You testified earlier that you thought ComCare would be a better conservator than Ms. Russell. What are you basing that on?
> A. I'm basing it on the fact that Ms. Russell has obstructed her psychiatric care for the year plus that she's been hospitalized here.
> Q. By refusing antipsychotics?
> A. Refusing to even attempt them. And, in the one attempt, stopping it while it was still within the parameters given by the hematologist that would be fine to continue.

Mary Corbitt ("Corbitt"), a social worker at MTMHI, testified. Corbitt testified as follows regarding certain of Russell's behavior:

> Q. Okay. I believe there was a time period where you were the designated contact for Ms. Russell with regard to Sophia Taylor; is that correct?
> A. Yes.
> Q. And do you know how that came about where you were the designated contact?
> A. I'm not for sure how. They said that the treatment team -- Ms. Russell was making too many phone calls and that they wanted one particular person to handle all of her calls.
> Q. Okay. And once you became the designated contact, do you know approximately what month that took place?
> A. Maybe July of last year. I'm not for sure.
> Q. Okay. And so approximately how many phone calls would you get a day from Ms. Russell?
> A. Average?
> Q. Average.
> A. About five to six.
> Q. Five to six. And that's just to you; is that correct?
> A. Yes.
> Q. Is that just the ones that you were there in the office and able to answer?
> A. No.
> Q. Okay. And whenever you -- would you return phone calls to Ms. Russell as well?
> A. Yes.
> Q. Okay. All right. And as a member of the treatment team, if you would, just go through and tell me a little bit about how a typical treatment team would go with Ms. Russell as part of the treatment team meeting.

A. We would all meet as a team. Ms. Russell would be present. She would request that Sophia not be present at the treatment team meeting because Sophia was often disruptive, but she is allowed to because she is a member of the team. And then --

Q. Sophia is?

A. She is. She is a member of the team. The doctors would discuss medications and what they wanted to put Sophia on, and Ms. Russell would decline, stating that she needed certain tests. When the test results came out, she would say she needed more tests. So nothing really was resolved in the treatment team meetings.

Q. Was she -- was there ever a time where she would be indecisive about her decision whether or not to allow something and just not give "yes" or "no" answers?

A. Yes.

Q. Okay. And do you believe that Ms. Russell has blocked the treatment team from being able to treat Ms. Taylor?

A. Yes.

***

Q. Okay. One more question. With regard to health insurance, what type of health insurance does Ms. Taylor have?

A. TennCare.

Q. And do you remember a time, during this treatment period especially, where Ms. Russell has threatened to cancel Ms. Taylor's health insurance through TennCare so that MTMHI would be left without a payer source?

A. Yes.

Q. And approximately how many times has she done that?

A. Three or four times.

Q. Okay. And what are the reasons that she gives for threatening to cancel?

A. I don't know.

Q. Does she use it as a tactic in order to get her -- her -- whatever she is wanting across, that she uses it as a control method?

A. Yes, she uses it as a control.

Russell testified. When questioned about her concerns over Taylor's white blood cell count, Russell stated as follows:

Q. So let's move on to the medication issue. What's the basis for your concern about her white blood count?

-4-

A. Out of all the times Sophia has been on antipsychotics from Vanderbilt to MTMHI to Tennessee Christian, she's always had a white count problem. She's had two bone marrow -- those things are painful -- two bone marrow tests to rule out a bone marrow problem with the WBC. They always come back normal, and she's been to two, maybe three hematologists that always come back and say it's medication-induced.

Okay. Now, Dr. Rogers had set guidelines for it not to drop below 2.5. Okay. And I admit the last time it dropped was following a hospitalization where she had drank from – ate soap, drank lotions, and ended up in the back of an ambulance with anaphylactic shock. Okay. When she came out, her white count was 10.1. I allowed them at that time to put her on the tube. Two weeks later, her white count was 2.6. And, granted, 2.6 is not 2.5, but I don't err on the side of caution. And seeing that they only do her white blood count once a week, which was precipitated Dr. Snell – I said, well, they're only going to – they're going to check her white count again next week. But you only got one point between 2.6 and 2.5. So I said stop. She's been on the Latuda, she's been on Prolixin, all of which I approved, she's been on Zyprexa since she -- all since she's been there. So to say I won't let him treat her or I won't let them use antipsychotics is not true.

Even down to the end when she said, "Can we try again," I said, "Only if I have adequate information to be able to determine whether or not her white count is high enough to have a cushion between 2.5 and give room to bring it down. Okay. Now, I'm not a doctor, but as conservator, it's my job -- if I go to a doctor and he asks me if I want to take a medicine, I'm going to make my decision, okay, so that's all I'm doing is exercising my responsibility to make sure any decision I make to give medication is to the best of my ability, best of my knowledge and what's best for her. We all need to do what's best for the patient, not just me.

\*\*\*

Q. Okay. And are you opposed -- even now as you sit here today, are you opposed to agreeing to antipsychotics?
A. I am not opposed to her taking antipsychotics, but I still maintain that the only way I will approve antipsychotics is if I have enough information to make a decision -- which by the way, MTMHI handbook, patient rights handbook, stipulates that I have the right to request and receive information necessary to make a sound decision, okay, and that -- I maintained that. The only way I will approve it is that I get the information I need.

-5-

I asked for labs. Even Ms. Corbitt couldn't find labs. When they -- I finally talked to the director of medical records, and when they were found, they were being kept in Teresa -- I don't know what Teresa's last name is – Teresa's office, under her protection. So when I paid for medical records thinking I'm getting labs and test results, I'm paying for them, but I'm not getting these things. I asked the social worker. She don't know where they are. We can't find them. I asked Dr. Elazar – that's a whole different story.

But at any rate, you know, I get no respect. I'm compared with other conservators that just rubber stamp things and just do what you want to do. And they've already told me -- you know, we called a conservator and asked them to do this, and they just said, "Do what you need to do." That's not me, and if that's what you are looking for, you know, that's not me. That's not protecting my daughter and doing what's best for her.

In May 2016, the Probate Court entered its final order in which it removed Russell as Taylor's conservator. We quote the Probate Court's findings, in relevant part, as follows:

6. As conservator of the person of the Respondent, Ms. Russell has exercised strict control over the medications administered to the Respondent, and has consistently refused to consent to the medication regimen recommended by the doctors at MTMHI.

7. Ms. Russell has refused to allow MTMHI to administer antipsychotic medications, individual therapy or counseling, or psychological testing to the Respondent, stating that she considers these forms of treatment and testing to be harmful to the Respondent or unnecessary.

8. The Respondent is not receiving proper treatment for her mental illness and her prognosis for rehabilitation and future hospital discharge is very poor as long as Ms. Russell continues to serve as the Respondent's conservator.

9. Ms. Russell's behavior toward MTMHI staff has been accusatory and threatening. Ms. Russell has regularly threatened to report clinical staff to professional boards without any reasonable basis to do so. In addition, Ms. Russell has threatened to cancel the Respondent's Medicare and TennCare benefits on several occasions, based on her perception that MTMHI staff failed to meet her demands, claiming that she will arrange it so MTMHI will have to assume payment of treatment-related expenses for the Respondent.

10. Ms. Russell has requested unnecessary lab work and other medical tests for the Respondent. In addition, she has consistently attempted to withhold medical information from MTMHI doctors regarding Ms. Taylor's medical treatment by outside providers. Moreover, she has demanded that the Respondent not be treated by certain staff or practitioners at MTMHI, which has been disruptive to the Respondent's care and treatment.

11. On multiple occasions, Ms. Russell has accused staff, including Respondent's treating psychiatrist, of falsifying the Respondent's medical records in an attempt to undermine her as conservator. Such accusations were without merit and only caused further disruption to the Respondent's care and treatment.

12. MTMHI staff has spent hundreds of hours on the phone with Ms. Russell. Ms. Russell calls MTMHI by phone with inordinate frequency. From February 16, 2015 through February 15, 2016, Ms. Russell placed a total of 4,600 phone calls to MTMHI, with an average of more than 350 calls to MTMHI per month. Records demonstrate that Ms. Russell's calls often exceed 30 times per day, and at times have exceeded 50 times per day. In addition to the inbound calls from Ms. Russell to MTMHI, records indicate that there were 2,101 calls from MTMHI to Ms. Russell from February 16, 2015 through February 15, 2016.

13. Ms. Russell's behavior in constantly calling and demanding to speak to clinical staff is harassing and disruptive to the hospital, and further demonstrates that she is unfit to continue serving as conservator of Ms. Taylor.

14. As a licensee of the Department, the Conflict Resolution Rules of the TDMHSAS, Chapter 0940-1-7 apply to MTMHI with regard to resolution of conflict(s) between a service recipient and a service provider. Under the Rule, a service recipient who has capacity or the legal representative, if the service recipient lacks capacity, may request conflict resolution procedures if he/she has been unable to resolve a conflict. A request for conflict resolution must be submitted to the licensee not more than thirty (30) calendar days after the occurrence of the matter which is the basis for the request. Conflict resolution must not exceed two (2) steps to finality: an informal meeting under 0940-1-7-.06(10) and an appeal under 0940-1-7-.06(11). The decision of the chief officer or designee is final and may not be appealed.

15. Although Ms. Russell never requested formal Conflict Resolution, MTMHI worked extensively with Ms. Russell to resolve her complaints and concerns in accordance with established Conflict Resolution Rules and procedures. In addition, Ms. Russell took advantage

of many resources available to her to get complaints heard or demands met, and MTMHI has cooperated and responded appropriately and in a timely manner.

16. Ms. Russell has also filed formal complaints with the following entities: the MTMHI Grievance Committee; the Office of Licensure for TDMHSAS; the Office of Consumer Affairs for TDMHSAS; Adult Protective Services at the Tennessee Department of Human Services (TDHS); the Tennessee Governor's Office; Disability Rights of Tennessee; Blue Care (TennCare); and The Joint Commission (Private Accreditation Organization). All of the complaints filed by Ms. Russell against MTMHI were found by these entities to be unsubstantiated, and most of the demands could not be met or were not required to be met by MTMHI in the treatment of Ms. Taylor.

17. Most attempts to resolve conflicts between Ms. Russell and MTMHI proved to be unsuccessful. Over the last year, it became apparent to MTMHI that Ms. Russell was not going to be satisfied with the hospital's attempts to resolve conflicts, even though MTMHI continued to make reasonable efforts to resolve complaints received from Ms. Russell.

18. The efforts by the TDMHSAS and MTMHI staff to work with Ms. Russell went well beyond the framework of the Conflict Resolution Rules and certainly exceeded their intended purpose. In essence, MTMHI has been engaged in conflict resolution with Ms. Russell the entire time the Respondent has been hospitalized at MTMHI. All attempts by MTMHI to resolve such conflicts with Ms. Russell have proven to be futile in this case.

19. In addition, the requirement for MTMHI to convene a Treatment Review Committee is inapplicable in this matter because the Respondent had a conservator appointed by this Court to make medical and psychiatric decisions. Specifically, Chapter 0940-1-2 of the TDMHSAS' Rules (Procedures for Prescription and Administration of Psychotropic Medications at Mental Health Institutes) does not apply in the treatment of service recipients who have an active conservator appointed by the Court to make medical decisions.

20. After numerous unsuccessful attempts by the treatment team to obtain Ms. Russell's consent for the administration of necessary antipsychotic medications, it would be futile to require MTMHI to convene a Treatment Review Committee for the same purpose prior to seeking the removal of Ms. Russell as conservator.

21. The Court finds that MTMHI complied with the conflict resolution rules and grievance procedures. In addition, the Court finds that a Treatment Review Committee was inapplicable as a matter of law and not required by statute, the Committee being expressly prevented from

-8-

overriding the wishes of Ms. Russell as conservator. See Tenn. Code Ann. § 33-6-107(c).

22. Based on the facts stated above, the Court finds that Ms. Russell has, and is, actively obstructing, harassing, and intimidating medical and psychiatric personnel at MTMHI and that she should be removed as conservator of Respondent Sophia Elaine Taylor, effective immediately.

23. In addition, the Court finds by clear and convincing proof that the best interests of the Respondent would be served by appointing ComCare, Inc. to serve as the successor conservator over Sophia Elaine Taylor for the purpose of making medical and psychiatric decisions, including the decision as to the proper medications for Respondent Sophia Elaine Taylor.

***

4. Upon the official discharge of the Respondent to the community from a Regional Mental Health Institute operated by the TDMHSAS, Ms. Russell may seek to be reappointed as the Respondent's limited medical conservator by filing an appropriate petition with this Court.

Russell timely filed an appeal to this Court.

### **Discussion**

We restate and consolidate the issues Russell raises on appeal into the following two dispositive issues: 1) whether Russell's due process rights were violated; and, 2) whether the Probate Court abused its discretion in removing Russell as conservator for Taylor.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

This Court previously has discussed the standard of review we are to apply when reviewing the decision by a trial court to appoint or remove a conservator, as follows:

A conservator occupies a fiduciary position of trust of the highest and most sacred character. *Grahl v. Davis*, 971 S.W.2d 373, 377 (Tenn.

-9-

1998) (citing *Meloy v. Nashville Trust Co.*, 177 Tenn. 340, 149 S.W.2d 73 (1941)).  Although the conservator plays a most important fiduciary role, it is significant to note that "the court itself is ultimately responsible for the disabled persons who come under its care and protection."  *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995) (citing *Hinds v. Buck*, 177 Tenn. 444, 150 S.W.2d 1071, 1072 (1941); *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991)). (footnote omitted).

The authority, rights and responsibilities of a conservator are not independent of the court. "Conservators act as the court's agent and are under the court's supervision." *Clayton*, 914 S.W.2d at 90.  The courts appointing conservators "retain continuing control over guardians and conservators because the persons who accept these appointments become 'quasi-officials' of the court appointing them." *Clayton*, 914 S.W.2d at 92 (citing *Logan v. Graper*, 155 Tenn. 565, 4 S.W.2d 955, 956 (1927)).

Following a conservator's appointment, the court may discharge a conservator or modify the duties and authority of the conservator if the court determines the conservator has failed to perform its duties and obligations, or if the court determines the conservator has failed to act in the ward's best interest so as to warrant modification.  Tenn. Code Ann. § 34-3-108(a).  Because a conservator is in a sense the agent through whom the probate court manages the affairs of a ward, the right to choose its representatives is important to the tribunal.  *Monteverde v. Christie*, 23 Tenn. App. 514, 134 S.W.2d 905, 910 (1939).  An appellate court, far removed from the scene will be slow, indeed, to substitute its judgment for that of the probate court.  *Id*.  "The removal of a guardian is largely a matter in the discretion of the Probate Judge and the court's action in this respect is not to be disturbed except upon a clear case of abuse of that discretion." *Id*.

*AmSouth Bank v. Cunningham*, 253 S.W.3d 636, 642-43 (Tenn. Ct. App. 2006) (footnote omitted).

Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made."  A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or

reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

We first address whether Russell's due process rights were violated. In her brief on appeal, Russell states: "[T]he objection to disallow as evidence Susan Swaner's affidavit asserting the accuracy and authenticity of a call log and the call log itself due to the inability to cross-examine the witness was denied by the court." Russell stated further: "[T]he Court did only allowed [sic] cross-examination to address Conflict Resolution for Affidavits from John Arrendondo and Joyce Kovacs although both addressed issues beyond Conflict Resolution." Russell cites to the Sixth Amendment of the United States Constitution and specifically to the Confrontation Clause.

We note initially that Russell is not a criminal defendant in this matter and thus her reliance upon the Sixth Amendment is inapt. As to Russell's argument generally that she was denied her right to present her case, we disagree. The record on appeal reflects that Russell, through her counsel, vigorously pursued her case at trial. Russell testified voluminously. The Probate Court heard ample testimony about efforts toward conflict resolution, medical regimens, Russell's conduct, and more. In the end, the Probate Court credited the Department's witnesses' testimony and did not credit Russell's testimony, as was its prerogative. It is not at all clear what additional evidence Russell believes likely would have altered the outcome of the trial and was excluded wrongly. Finding no violations of Russell's right to due process, we find this issue to be without merit.

The next and final issue we address is whether the Probate Court abused its discretion in removing Russell as conservator for Taylor. Russell argues that she is best suited to serve as conservator for her daughter. In support of her argument that she should have priority, Russell cites Tenn. Code Ann. § 34-3-103 (2015) which provides:

Subject to the court's determination of what is in the best interests of the person with a disability, the court shall consider the following persons in the order listed for appointment of the conservator:

(1) The person or persons designated in a writing signed by the alleged person with a disability;

(2) The spouse of the person with a disability;

(3) Any child of the person with a disability;

-11-

(4) Closest relative or relatives of the person with a disability;

(5) A district public guardian as described by § 34-7-104; and

(6) Other person or persons.

The problem with Russell's argument is that the list of statutory preferences is subject to the court's determination of what is in the best interests of the person with a disability. The Probate Court heard the evidence and concluded that, despite their close family ties, Russell continuing as Taylor's conservator is contrary to Taylor's best interests.[1] The Probate Court found further that, conversely, ComCare's appointment as Taylor's conservator was in Taylor's best interest.

We have reviewed the record carefully. The evidence does not preponderate against the factual findings made by the Probate Court. Russell has spent many years coping with her daughter's illness and has acquired a great deal of knowledge about her condition. However, Russell is not a doctor. The evidence is that Taylor's condition is not improving at least in part due to Russell's objections to recommended treatment. Perhaps the most cogent and concise summation of the Probate Court's reasoning is found in this withering statement from the final judgment: "[T]he Court finds that Ms. Russell has, and is, actively obstructing, harassing, and intimidating medical and psychiatric personnel at MTMHI and that she should be removed as conservator of Respondent Sophia Elaine Taylor." Based on this record, we find nothing factually inaccurate, illogical, or unjust about this statement made by the Probate Court. We, therefore, conclude that the Probate Court did not abuse its discretion in removing Russell as Taylor's conservator. We affirm the judgment of the Probate Court in its entirety.

## Conclusion

The judgment of the Probate Court is affirmed, and this cause is remanded to the Probate Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Cheryl R. Russell, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[1] Taylor did not testify at trial. Taylor's Guardian Ad Litem testified that in one meeting with Taylor, she expressed a desire to keep Russell as her conservator. However, at a subsequent meeting one month later, Taylor stated indirectly that she wanted Russell removed.